EXHIBIT A

SIG TRAVEL POLICIES
EFFECTIVE FEBRUARY 15, 2007

The purpose of this policy is to provide guidance to managers and employees regarding the rules that will be applied to business travel. Its aim is to establish and communicate standards and procedures for controlling travel costs and to ensure consistent treatment of all employees who travel on Company business.

Our basic policy is that employees who must be away from home on Company business should travel comfortably, but economically, and should exercise the same care in incurring expenses that they would when traveling for personal reasons. A guideline for spending Company funds for entertainment should be to spend the funds as if they were your own.

It is, of course, impossible to anticipate every situation that may be encountered while traveling on business. Thus, we expect each employee to exercise good judgment in incurring travel expenses and to obtain prior approval from your manager for expenditures that are not specifically covered under this policy or where specifically noted.

AIR TRAVEL

Domestic Travel
Coach/Economy Class is required to be used by all SIG employees for all domestic flights. Some flights may require a connection.

Trans-Pacific Travel
For trans-pacific international flights, SIG employees are eligible to fly business class into a continental US airport. Onward domestic US travel will be scheduled within 3 hours of scheduled arrival into the continental US. Additionally, onward travel to US destinations may be in coach class.

Trans Atlantic Travel

Employees traveling between the continental US and Europe may choose from one of two options; either non-stop service in coach class or premium economy service with a connection thru London where available.

Business class travel will be approved for employees who:
1. Work at least five (5) hours on the day of travel; or
2. Whose flight's duration exceeds eight (8) hours.
3. All business class upgrades must be approved by Aaron Hantman.

A connection may be required for example a train or sedan between Philadelphia and New York City. Furthermore, coach class may be required for the continental US portion for flights under three (3) hours.

Our Corporate Travel Department will advise you of any special recommendations regarding special promotion airfares or special negotiated fares with a particular airline. Our Corporate Travel Department will book the travel in the least expensive fashion to accomplish the employee's travel needs. This may include a layover or a change of planes. Our Corporate Travel Department is required by SIG Management to book travel in this fashion. All requests for exceptions must be submitted to Aaron Hantman for approval.

Generally, making advance reservations will reduce the cost of travel to the Company and provide more flexibility to the employee in booking travel. It is the employee's responsibility to make definite travel plans as soon as possible.

Frequent Flyer miles will be awarded to the employee. The employee, not the Travel Department or SIG, is responsible for managing the employee's own frequent flyer programs. Frequent flyer miles may be used by the employee to upgrade their travel plans on business or personal travel. Please call the Travel Department if you have questions.

RAIL TRAVEL

When traveling by rail in the U.S., all employees must travel by unreserved coach fare. We understand that circumstances may present themselves, when you may have to travel early in the morning or late in the evening. In these instances, you may ask your manager to approve an upgrade to the Metroliner or Acela high speed rail service. The travel department must receive written approval from your manager before reservations are made.
HOTEL STAYS

When travel requires overnight stay, our Corporate Travel Department will make arrangements for you at one of SIG's preferred hotels. Please keep in mind that SIG will not reimburse employees for such things as in-room movies or laundry and dry cleaning services. Additionally, all long distance phone calls should be placed either via cell phone or with a SIG calling card.

HOTEL STAYS FOR SALES DEPARTMENT

If you are traveling with a customer or attending a conference with a customer, you may request a hotel upgrade, which must be approved by Aaron Hantman in writing, prior to the accommodations being reserved by our Travel Director.

GROUND TRANSPORTATION

Whenever possible, employees should utilize the local subway and rail systems or taxis when traveling on company business. If it is necessary to rent a car during a business trip, you should decline the optional insurance offered by the rental agency. Insurance for a rental car is usually provided by the credit card used to purchase the rental. If you are using a credit card other than a SIG corporate card, please check with the issuer regarding Insurance for rental cars. If there is a compelling business reason to use another type of ground transportation such as a car service, your manager must provide written approval to the travel department.

MEAL EXPENSES

Employees are expected to use discretion when dining while traveling. All reasonable expenses will be reimbursed.

PAYMENT METHOD

All travel expenses, where possible, will be billed directly to SIG. If this is not possible, all bills such as hotels, ground transportation, meals, etc., should be paid by you and the receipts should be submitted to your manager for reimbursement by SIG. The Reimbursement Form can be obtained from your Office manager and must be signed by your Manager.



401 CITY AVENUE. STE 220, BALA CYNWYD, PA 19004-1188. 610.617.... WWW.SIG.COM
BALA CYNWYD  BOSTON  CHICAGO  DUBLIN  LOS ANGELES  NEW YORK  PHILADELPHIA  SAN FRANCISCO  SHANGHAI  STAMFORD  SYDNEY



# EMPLOYMENT AGREEMENT BETWEEN

## SUSQUEHANNA INTERNATIONAL GROUP, LLP

and

## DOUGLAS FREY

This Agreement is entered into on this 19TH day of January, 2007 by and between Susquehanna International Group, LLP, a limited liability partnership formed and registered under the laws of Delaware with a principal place of business at 401 City Avenue, Bala Cynwyd, Pennsylvania 19004 (together with its related and/or affiliated entities, "SIG"), and Douglas L. Frey ("Employee"), an individual residing at 4255 Encinas Drive, La Canada, California 91011.

WHEREAS, SIG is engaged in, among other businesses, the provision of institutional brokerage services and the active trading of securities and other financial products;

WHEREAS, SIG desires to continue to employ Employee as a research salesperson, and Employee desires to continue to be employed by SIG as a research salesperson, on the terms and conditions set forth in this Agreement.

WHEREFORE, the parties hereto, intending to be legally bound hereby, do agree as follows:

1. Employment. SIG agrees to continue to employ Employee, and Employee agrees to continue to be employed by SIG, on the terms and conditions set forth in this Agreement from the date set forth above until December 31, 2008 (the "Term"). Employee will devote his or her entire working time, energy, skill and best efforts to further the business interests of SIG. While employed by SIG, Employee shall maintain all required licenses and registrations and comply with all applicable laws, regulations, exchange requirements and SIG policies, procedures and guidelines. SIG will be responsible for the costs associated with maintaining all required licenses and registrations.

2. Representation and Warranty. Except for SIG, Employee represents and warrants that (i) he or she is not presently under a contract, written or oral, to provide services as a research salesperson or in any other brokerage capacity, (ii) he or she is not subject to any restriction regarding the solicitation or hiring of employees or the solicitation of business from or the performance of services for any individuals or entities, and (iii) neither the execution nor delivery of this Agreement constitutes a breach of any other contract of which Employee is subject. Employee further represents and warrants that he/she has not received any subpoena from, and is not the subject of any current, pending or threatened complaint, proceeding or investigation filed, initiated or conducted by, any judicial, governmental, administrative or self-regulatory body or by any of his or her former

employers. Employee will defend and hold SIG and its officers, directors, employees and agents harmless from any and all claims, costs and expenses suffered or incurred by SIG, including attorneys' fees, as a result of, or in connection with, a breach of any representation contained in this paragraph.

3. <u>Compensation</u>. Employee shall receive compensation while employed by, and providing services to, SIG under this Agreement as follows:

(a) Employee shall receive a salary at a monthly rate equal to $20,833.33.

(b) Employee shall be eligible to receive a discretionary bonus for each of the calendar years ending December 31, 2007 and 2008. The discretionary bonuses payable under this paragraph 3(b) refer only to those bonuses that may be awarded by SIG in its sole discretion; provided that the discretionary bonus payable to Employee under this Paragraph 3(b) in respect of each of calendar years 2007 and 2008 shall not be less than $550,000.00 (the "Minimum Amount"). The Minimum Amount and the discretionary bonuses payable hereunder shall be pro rated if Employee is on leave of absence from SIG (because of disability or otherwise) during such calendar year. When determining the amount of a discretionary bonus payable pursuant to this Paragraph 3(b), SIG may consider such factors as it deems relevant, such as by way of example only, (i) the amount of Net Equity Production (as defined below) generated from each Employee Assigned Account (as defined below) while covered by Employee during such calendar year, (ii) Employee's relative contribution to generating Net Equity Production from the Employee Assigned Accounts, (iii) Employee's ability to cross-sell SIG's product offerings, (iv) whether Employee works well with SIG's other research salespersons and sales traders, analysts and management and whether Employee mentors SIG's junior sales people and analysts, (v) how Employee is rated in peer reviews completed by research analysts, and (vi) SIG's overall performance during such calendar year. Employee understands that the bonus amounts payable in respect of calendar years 2007 and 2008 pursuant to this paragraph 3(b) (in excess of the Minimum Amount for each such year) are entirely within the discretion of SIG and SIG retains the absolute, unfettered discretion to grant such bonuses (in excess of the Minimum Amount) as it deems appropriate or to grant no bonuses in excess of the Minimum Amount.

(c) As used in this Agreement:

(i) "<u>Employee Assigned Account</u>" shall mean any institutional brokerage account to which Employee is assigned by SIG to provide corporate research sales coverage. The Employee Assigned Accounts are subject to change as provided in clause (iv) below.

(ii) "<u>Net Equity Production</u>" shall mean the sum of: (a) the net commission income collected by SIG for Traditional Equity Trades (as defined below), ETF trades, program trades or option trades, as applicable, plus/minus (b) the net profit/loss, after deducting all variable trading costs (including SIG's internal charges for clearance and NYSE floor brokerage (including SIG's NYSE house brokers) which charges shall be within prevailing market rates), realized by SIG in Employee's account as a result of Traditional Equity Trades, ETF trades or program trades, as applicable (provided, however, that for ETF trades net profit/loss shall be calculated using the theoretical (rather than the actual) profit or loss assigned to each ETF trade, which will take into account all variable trading costs) minus (c) all Excess Travel and Entertainment Expenses (as defined below).

(iii) "Traditional Equity Trades" shall mean trades of shares of common or preferred stock in a company that is not a fund, trust or similar entity.

(iv) SIG's determination of the amount of Net Equity Production and net commission income generated (including all components thereof, including the theoretical profits or losses from Traditional Equity Trades and ETF trades) shall be conclusive. SIG shall have the right at any time and from time to time in its sole and absolute discretion to add or subtract Employee Assigned Accounts. SIG shall promptly notify Employee of any change to the Employee Assigned Accounts.

(v) "Excess Travel and Entertainment Expenses" shall mean all travel and entertainment expenses incurred by Employee in excess of $350 without obtaining the prior written authorization of Employee's manager or the Head of Institutional Sales, currently Aaron Hantman. A copy of the current policy is attached hereto as Exhibit A. For the avoidance of doubt, SIG is not required to reimburse Employee for any travel or entertainment expenses incurred by Employee in violation of SIG's travel and entertainment policies in effect from time to time, but if it pays any such amounts, such expenses shall constitute Excess Travel and Entertainment Expenses.

(d) Notwithstanding anything herein to the contrary, no salary or bonuses will be paid under this paragraph 3 in the event Employee resigns other than for Good Reason (as defined below) or is terminated for Cause (as defined below) prior to the award and payment of such salary or bonus by SIG. All compensation (including bonuses) shall be paid in accordance with SIG's normal payroll policies as in effect from time to time and shall be net of any applicable withholding requirements.

(e) Employee agrees and acknowledges that SIG may set off any amounts that he may hereafter owe to SIG against any amounts payable by SIG to him under this Agreement or otherwise.

4. Termination.

(a) By SIG. During the Term, SIG may terminate Employee's employment for Cause (as defined below) by providing Employee notice of the effective date of such termination (which effective date may be immediately). For purposes of this Agreement, "Cause" means either a) that Employee commits (or has committed) a regulatory or criminal violation, or becomes the subject of an investigation by any governmental, administrative or self-regulatory body or by any of his or her former employers, in either event, stemming from conduct alleged to have been committed by Employee while acting in his or her capacity as a registered representative or otherwise in connection with the trading of securities or other financial products or the Brokerage Business (as defined below), whether before or during his employment by SIG, that in SIG's sole discretion could be damaging to SIG's or employee's business reputation or b) a determination by SIG that Employee failed to act in good faith, in furtherance of the business interests of SIG or in accordance with the terms set forth in this Agreement or the standards of

conduct and performance adopted by SIG generally for its employees, including by way of example only, any of the following: (i) a willful failure by Employee to perform his or her duties hereunder (including neglect of such duties); (ii) conduct by Employee that is materially injurious to SIG, monetarily or otherwise, (iii) a breach by Employee of any of his or her material obligations under this Agreement; (iv) Employee engaging in any criminal activity or other activity involving moral turpitude; or (v) any conduct by Employee involving significant undisclosed conflict of interest, serious impropriety, breach of corporate duty or misappropriation of any money or other assets or properties of SIG or any other party with which SIG does business.

(b) By Employee. During the Term, Employee may resign his employment for Good Reason, provided that Employee has given SIG written notice of the event or events constituting Good Reason and a reasonable opportunity (but not less than seven (7) nor more than ten (10) calendar days) for SIG to cure such event or events. For purposes of this Agreement, "Good Reason" means (i) the relocation of Employee's primary place of employment outside of Los Angeles County, California (including in connection with the closure of SIG's office in Los Angeles County, California) without his written consent and (ii) a determination by SIG to cease to engage in the provision of institutional brokerage services.

(c) In the event Employee resigns other than for Good Reason or is terminated for Cause, neither SIG nor Employee shall have further obligations or liabilities hereunder, except: (a) SIG shall pay Employee, in accordance with SIG's normal payroll practices, all accrued but unpaid salary through such termination date; and (b) the provisions of Paragraphs 5 through 14 shall remain in full force and effect. In the event that on or before December 31, 2008, SIG terminates Employee without Cause or Employee resigns for Good Reason, neither SIG nor Employee shall have further obligations or liabilities hereunder, except that (a) after the termination date, the provisions of paragraphs 6 through 14 shall remain in full force and effect, and (b) SIG shall pay Employee in accordance with SIG's normal payroll practices (i) his or her salary pursuant to Paragraph 3(a) until the earlier of the end of the Term and the occurrence of an Early Termination Event (as defined below), and (ii) so long as an Early Termination Event has not occurred prior to the end of the Term, the unpaid Minimum Amount for each of calendar years 2007 and 2008 provided for pursuant to Paragraph 3(b). Any payments under clause (ii) above shall be made on the date that SIG generally pays bonuses to its employees in respect of calendar years 2007 or 2008, as applicable. An Early Termination Event shall occur if Employee, directly or indirectly, in any manner or capacity, engages in any activity (including the provision

of corporate research or the Brokerage Business (as defined below)) reasonably similar to activities that Employee performed for SIG. Employee shall have an affirmative obligation to inform SIG in advance of the occurrence of an Early Termination Event prior to the end of the Term. For the avoidance of doubt, In the event that Employee resigns his or her employment with SIG on or after January 1, 2009, Employee shall nevertheless be entitled to receive his or her unpaid discretionary bonus in respect of calendar year 2008, which bonus shall not be less than the Minimum Amount.

5. <u>Exclusive Employment</u>. In addition to other valuable consideration received by Employee, Employee acknowledges and recognizes the highly competitive nature of SIG's business and that as an Employee of SIG he or she shall have access to SIG trade secrets (as defined in the Uniform Trade Secrets Act) and other Confidential Information. Employee accordingly agrees, that until the later of the expiration of the Term and the termination of Employee's employment hereunder, Employee shall not, without the written consent of a Member of the Management Committee of SIG, directly or indirectly, in any manner or capacity (as a stockholder, sole proprietor, officer, director, employee, partner, agent, consultant or in any other corporate or representative capacity), engage (or assist or support any other person or entity) in any activity (including the provision of corporate research or the Brokerage Business (as defined below)) reasonably similar to activities that Employee performs for SIG. As used herein, the term "Brokerage Business" means the provision of research sales and/or sales trading and/or transaction execution services in any equity and/or equity related product(s) (including, without limitation, ETFs and options) and/or in any type(s) of product(s) that SIG is providing, or is planning to provide, at the time Employee's employment by SIG terminates.

6. <u>Acknowledgments</u>. Employee understands that the provisions of paragraph 5 hereof may limit his or her ability to earn a livelihood in a business similar to the business of SIG, but nevertheless believes that he or she shall receive remuneration and other benefits hereunder sufficient to justify the restrictions contained in such provisions. Employee also acknowledges that because SIG's business is international in scope the restrictions set forth in this Agreement are reasonable in geographic scope, even though not limited to any particular area or market, and that, given his or her education, skills and abilities, these restrictions would not prevent him or her from earning a living. Employee recognizes that SIG would not employ Employee if Employee were not willing to agree to Paragraph 5. Employee further acknowledges that he or she shall not have the right to inspect or review or audit the books or records of SIG.

7. <u>Time</u>. The length of time stated in Paragraph 5 (at least through December 31, 2008) and in the Non-Interference Agreement (as defined below) (nine months and five years) shall not run during any period that Employee is in violation of any of the terms of Paragraph 5 or the Non-Interference Agreement and shall be extended for the period of any such violation.

8. **Remedies**. Employee acknowledges that SIG would be irreparably harmed if Employee were to breach any of the terms of this Agreement and, therefore, agrees that SIG shall be entitled to injunctive relief to prevent any breaches or threatened breaches of this Agreement and to specific performance of its terms as well as any other legal or equitable remedies it may have.

9. **Survival**. The obligations of the Employee under Paragraphs 5 through 14 shall survive the termination of Employee's employment with SIG.

10. **Severability; Modification by Court**. If any term, provision or paragraph of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable for any reason, such determination shall not affect the remaining terms, provisions or paragraphs of this Agreement which shall continue to be given full force and effect. If any term, provision or paragraph of this Agreement is determined by a court of competent jurisdiction to be unenforceable because of the duration thereof, the geographical area included therein or the scope of the prohibited work or activity, the parties hereby expressly agree that the court making such determination shall have the power to reduce the duration and/or restrict the geographic area of such term, provision or paragraph and/or reduce the scope of prohibited work or activity and/or delete such specific words or phrases which the court shall deem necessary to permit enforcement of such term, provision or paragraph in restricted form. Should any court of competent jurisdiction find any term, provision or paragraph of this Agreement invalid or unenforceable, or enforceable only in restricted form, then any such finding shall apply only to the current or former employee(s) involved as the party(ies) in that court proceeding, and shall not serve to alter or amend any agreement between SIG and any other individual.

11. **Successors**. This Agreement shall not be assigned by Employee or by SIG except that SIG may assign this Agreement in the event of a change in control or sale of SIG in which case this Agreement shall inure to the benefit of SIG's successors and assigns.

12. **Governing Law**. This Agreement and questions relating to its validity, interpretation, performance and enforcement shall be governed and construed according to the laws of the Commonwealth of Pennsylvania. Employee and SIG submit to the exclusive jurisdiction of the state courts located in Montgomery County, Pennsylvania and to the Federal courts located in Philadelphia, Pennsylvania as to all actions and proceedings relating in any way to this Agreement that are not determined by arbitration pursuant to the Dispute Resolution Agreement referred to below. Employee and SIG further agree that such courts shall have personal jurisdiction over each of them and are a proper venue and a convenient forum with respect to all such actions or proceedings.

13. **Waiver of Breach; Selective Enforcement**. The waiver by SIG of Employee's breach of any provision or covenants of this Agreement shall not operate or be construed as a waiver of any subsequent breach by Employee of the same or a different provision. Selective enforcement of this type of Agreement

against some persons and not others shall in no way be construed as affecting the enforceability of this Agreement with Employee, or be construed in any way against SIG.

14. **Entire Agreement.** This Agreement, together with the Confidential Information Agreement, Non-Interference Agreement and Dispute Resolution Agreement, each of which are dated as of March 28, 2005 and were executed by the Employee as a condition of his or her employment, the terms of which are incorporated by reference herein, contain the entire understanding among the parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understanding, inducements of conditions, express or implied, oral or written except as herein contained; provided, however, that Employee's compensation in respect of calendar year 2006 shall be governed by the Employment Agreement, dated as of March 28, 2005, by and between Employee and SIG. This Agreement may not be modified or amended, other than by an agreement in writing signed by the parties.

Sincerely,

Thomas Kennedy, Director
For Susquehanna International Group, LLP

Agreed and Accepted:

DOUGLAS L. FREY

Dated: JONUARY 29, 2007

## EXHIBIT A

SIG TRAVEL POLICIES
EFFECTIVE SEPTEMBER 26, 2003

The purpose of this policy is to provide guidance to managers and employees regarding the rules that will be applied to business travel. Its aim is to establish and communicate standards and procedures for controlling travel costs and to ensure consistent treatment of all employees who travel on Company business.

Our basic policy is that employees who must be away from home on Company business should travel comfortably, but economically, and should exercise the same care in incurring expenses that they would when traveling for personal reasons. A guideline for spending Company funds for entertainment should be to spend the funds as if they were your own.

It is, of course, impossible to anticipate every situation that may be encountered while traveling on business. Thus, we expect each employee to exercise good judgment in incurring travel expenses and to obtain prior approval from your manager for expenditures that are not specifically covered under this policy or where specifically noted.

AIR TRAVEL

Domestic Travel
Coach/Economy Class is required to be used by all SIG employees for all domestic flights. Some flights may require a connection.

Trans-Pacific Travel
For trans-pacific international flights, SIG employees are eligible to fly business class into a continental US airport. Onward domestic US travel will be scheduled within 3 hours of scheduled arrival into the continental US. Additionally, onward travel to US destinations may be in coach class.

Trans Atlantic Travel
Employees traveling between the continental US and Europe may choose from one of two options; either non-stop service in coach class or premium economy service with a connection thru London where available.

Business class travel will be approved for employees who:
1. Work at least five (5) hours on the day of travel; or
2. Whose flight's duration exceeds eight (8) hours.
3. All business class upgrades must be approved by Todd Simkin.

A connection may be required for example a train or sedan between Philadelphia and New York City. Furthermore, coach class may be required for the continental US portion for flights under three (3) hours.

Our Corporate Travel Department will advise you of any special recommendations regarding special promotion airfares or special negotiated fares with a particular airline. Our Corporate Travel Department will book the travel in the least expensive fashion to accomplish the employee's travel needs. This may include a layover or a change of planes. Our Corporate Travel Department is required by SIG Management to book travel in this fashion. All requests for exceptions must be submitted to Todd Simkin for approval.

Generally, making advance reservations will reduce the cost of travel to the Company and provide more flexibility to the employee in booking travel. It is the employee's responsibility to make definite travel plans as soon as possible.

Frequent Flyer miles will be awarded to the employee. The employee, not the Travel Department or SIG, is responsible for managing the employee's own frequent flyer programs. Frequent flyer miles may be used by the employee to upgrade their travel plans on business or personal travel. Please call the Travel Department if you have questions.

RAIL TRAVEL

When traveling by rail in the U.S., all employees must travel by unreserved coach fare. We understand that circumstances may present themselves, when you may have to travel early in the morning or late in the evening. In these instances, you may ask your manager to approve an upgrade to the Metroliner or Acela high speed rail service. The travel department must receive written approval from your manager before reservations are made.

HOTEL STAYS

When travel requires overnight stay, our Corporate Travel Department will make arrangements for you at one of SIG's preferred hotels. Please keep in mind that SIG will not reimburse employees for such things as in-room movies or laundry and dry cleaning services. Additionally, all long distance phone calls should be placed either via cell phone or with a SIG calling card.

HOTEL STAYS FOR SALES DEPARTMENT

If you are traveling with a customer or attending a conference with a customer, you may request a hotel upgrade, which must be approved by Todd Simkin in writing, prior to the accommodations being reserved by our Travel Director.

GROUND TRANSPORTATION

Whenever possible, employees should utilize the local subway and rail systems or taxis when traveling on company business. If it is necessary to rent a car during a business trip, you should decline the optional insurance offered by the rental agency. Insurance for a rental car is usually provided by the credit card used to purchase the rental. If you are using a credit card other than a SIG corporate card, please check with the issuer regarding insurance for rental cars. If there is a compelling business reason to use another type of ground transportation such as a car service, your manager must provide written approval to the travel department.

MEAL EXPENSES

Employees are expected to use discretion when dining while traveling. All reasonable expenses will be reimbursed.

PAYMENT METHOD

All travel expenses, where possible, will be billed directly to SIG. If this is not possible, all bills such as hotels, ground transportation, meals, etc., should be paid by you and the receipts should be submitted to your manager

for reimbursement by SIG. The Reimbursement Form can be obtained from your Office manager and must be signed by your Manager.




**SIG**
SUSQUEHANNA INTERNATIONAL GROUP, LLP

401 CITY AVENUE    220. BALA CYNWYD, PA 19004-1188. 610.61    WWW.SIG.COM
AMSTERDAM  BALA    O  CHICAGO  DUBLIN  NEW YORK  PHILADELPHIA    ANCISCO  SYDNEY

## EMPLOYMENT AGREEMENT BETWEEN

## SUSQUEHANNA INTERNATIONAL GROUP, LLP

and

## DOUGLAS L. FREY

This Agreement is entered into on this __28__ day of March, 2005 by and between Susquehanna International Group, LLP, a limited liability partnership formed and registered under the laws of Delaware with a principal place of business at 401 City Avenue, Bala Cynwyd, Pennsylvania 19004 (together with its related and/or affiliated entities, "SIG"), and Douglas L. Frey ("Employee"), an individual residing at 4255 Encinas Drive, La Canada, California 91011.

WHEREAS, SIG is engaged in, among other businesses, the provision of institutional brokerage services and the active trading of securities and other financial products; and

WHEREAS, SIG desires to employ Employee, and Employee desires to be employed by SIG, as a research salesperson on the terms and conditions set forth in this Agreement.

WHEREFORE, the parties hereto, intending to be legally bound hereby, do agree as follows:

1.  <u>Employment</u>.  Provided that Employee commences his employment hereunder no later than April 11, 2005, SIG agrees to employ Employee, and Employee agrees to be employed by SIG, on the terms and conditions set forth in this Agreement from the date Employee commences employment hereunder until December 31, 2006 (the "Term"). In the event Employee fails to commence employment hereunder on or before April 11, 2005, this Agreement shall in SIG's sole and absolute discretion be null and void. The date Employee commences his employment hereunder shall be hereinafter referred to as the "Effective Date." Employee will devote his or her entire working time, energy, skill and best efforts to further the business interests of SIG. While employed by SIG, Employee shall maintain all required licenses and registrations and comply with all applicable laws, regulations, exchange requirements and SIG policies, procedures and guidelines. SIG will be responsible for the costs associated with maintaining all required licenses and registrations.

2.  <u>Representation and Warranty</u>.  Except for SIG, Employee represents and warrants that he or she is not presently under a contract, written or oral, to provide services as a research salesperson or in any other brokerage capacity and further represents that neither the execution nor delivery of this Agreement constitutes a breach of any other contract of which Employee is subject. Employee further represents and warrants that he/she has not received any subpoena from, and is not the subject of any current, pending or threatened complaint, proceeding or investigation filed, initiated or conducted by, any judicial, governmental, administrative or self-regulatory body or by any of his or her former employers. Employee will defend and hold SIG and its officers, directors, employees and agents harmless from any and all claims, costs and expenses suffered or incurred by SIG, including attorneys' fees, as a result of, or in connection with, a breach of any representation contained in this paragraph.

March 24, 2005

3. <u>Compensation</u>. Employee shall receive compensation while employed by, and providing services to, SIG under this Agreement as follows:

(a) Employee shall receive a salary at a monthly rate equal to $12,500.00.

(b) Employee shall receive a fixed bonus for calendar year 2005 equal to the amount by which $750,000 (which amount shall be pro rated if Employee is on a leave of absence from SIG (because of disability or otherwise) during calendar year 2005) exceeds the aggregate amount of gross salary Employee received from SIG pursuant to Paragraph 3(a) during calendar year 2005.

(c) Employee shall be entitled to receive an aggregate Net Equity Production bonus in respect of the Term (i.e., the period beginning on the Effective Date and ending on the conclusion of the Term) equal to: (i) the Employee's Total Account NEP (as defined below) for the Term minus (ii) the aggregate amount of gross salary Employee received from SIG pursuant to Paragraph 3(a) during the Term and minus (iii) the gross amount of the fixed bonus Employee received from SIG pursuant to Paragraph 3(b) during the Term.

(d) Employee shall also be eligible to receive a discretionary bonus in respect of the Term in an amount up to the Employee's Total Supplemental Bonus Amount (as defined below) applicable during the Term. The discretionary bonus payable under this paragraph 3(d) refers only to that bonus which may be awarded by SIG in its sole discretion. When determining whether to award such bonus and the amount of such bonus, SIG may consider such factors as it deems relevant, such as by way of example only: (i) the amount of Net Equity Production (as defined below) generated from each Employee Assigned Account (as defined below) while covered by Employee during the Term, (ii) Employee's relative contribution to generating Net Equity Production from the Employee Assigned Accounts, (iii) Employee's ability to cross-sell SIG's product offerings, (iv) whether Employee works well with SIG's other research salespersons and sales traders, analysts and management and whether Employee mentors SIG's junior sales people and analysts, (v) how Employee is rated in peer reviews completed by research analysts, and (vi) SIG's overall performance during the Term. Employee understands that the bonus amount payable pursuant to this paragraph 3(d) is entirely within the discretion of SIG and SIG retains the absolute, unfettered discretion to grant such bonus as it deems appropriate or no discretionary bonus at all.

(e) Notwithstanding anything in Paragraphs 3(a)-(d) to the contrary, the sum of (i) the aggregate amount of gross salary Employee received from SIG pursuant to Paragraph 3(a) during the Term plus (ii) the gross amount of the fixed bonus Employee received from SIG pursuant to Paragraph 3(b) during the Term plus (iii) the gross amount of Employee's Net Equity Production bonus pursuant to Paragraph 3(c) for the Term plus (iv) the gross amount of the discretionary bonus Employee received from SIG pursuant to Paragraph 3(d) for the Term, shall not be less than $1,750,000 (the "Minimum Amount") (which Minimum Amount shall be pro rated if Employee is on a leave of absence from SIG (because of disability or otherwise) during the Term.

(f) As used in this Agreement:

(i) "<u>Total Account NEP</u>" means with respect to the Term, the sum of all of the Employee's Individual Account NEPs for the Term.

(ii) An "<u>Individual Account NEP</u>" means, for each Employee Assigned Account covered by Employee during the Term, the product of (x) the Net Equity Production generated from the Employee Assigned Account while covered by Employee during the Term multiplied by (y) the Account NEP Percentage(s) applicable to such Employee Assigned Account from time to time during the Term.

-2-

The initial Account NEP Percentage applicable to each Employee Assigned Account is set forth on Exhibit A. Each Account NEP Percentage is subject to increase or decrease as provided in clause (viii) below.

(iii) "Total Supplemental Bonus Amount" means with respect to the Term, the sum of all of the Employee's Individual Account Supplemental Bonus Amounts for the Term.

(iv) "Individual Account Supplemental Bonus Amount" means, for each Employee Assigned Account covered by Employee during the Term, the product of (x) the Net Equity Production (as defined below) generated from the Employee Assigned Account while covered by Employee during the Term multiplied by (y) the Supplemental Bonus Percentage(s) applicable to such Employee Assigned Account from time to time during the Term. The initial Supplemental Bonus Percentage applicable to each Employee Assigned Account is set forth on Exhibit A. Each Supplemental Bonus Percentage is subject to increase or decrease as provided in clause (viii) below.

(v) "Employee Assigned Account" shall mean any institutional brokerage account to which Employee is assigned by SIG to provide corporate research sales coverage. The Employee Assigned Accounts are subject to change as provided in clause (viii) below.

(vi) "Net Equity Production" shall mean the sum of: (a) the commission income collected by SIG for Traditional Equity Trades (as defined below), ETF trades, program trades or option trades, as applicable, plus/minus (b) the net profit/loss, after deducting all variable trading costs (including SIG's internal charges for clearance and NYSE floor brokerage (including SIG's NYSE house brokers) which charges shall be within prevailing market rates), realized by SIG in Employee's account as a result of Traditional Equity Trades, ETF trades or program trades, as applicable (provided, however, that for ETF trades net profit/loss shall be calculated using the theoretical (rather than the actual) profit or loss assigned to each ETF trade, which will take into account all variable trading costs) minus (c) all Excess Travel and Entertainment Expenses (as defined below).

(vii) "Traditional Equity Trades" shall mean trades of shares of common or preferred stock in a company that is not a fund, trust or similar entity.

(viii) SIG's determination of the amount of Net Equity Production and net commission income generated (including all components thereof, including the theoretical profits or losses from Traditional Equity and ETF trades) shall be conclusive. SIG shall have the right at any time and from time to time in its sole and absolute discretion to (x) add or subtract Employee Assigned Accounts, (y) increase or decrease the Account NEP Percentage applicable to any Employee Assigned Accounts and (z) increase or decrease the Supplemental Bonus Percentage applicable to any Employee Assigned Accounts. SIG shall maintain a spreadsheet of the Employee Assigned Accounts and their respective Account NEP Percentages and Supplemental Bonus Percentages (the "Employee Account Statement"). The initial Employee Account Statement is set forth on Exhibit A. Upon Employee commencing employment hereunder, the Employee Account Statement shall be maintained in a database controlled by SIG. SIG will update the Employee Account Statement from time to time to reflect any changes it makes to the Employee Assigned Accounts, Account NEP Percentage or Supplemental Bonus Percentage. SIG shall promptly notify Employee of any change to the Employee Account Statement. A copy of the Employee Account Statement will be made available to Employee on a regular basis as SIG in its sole and absolute discretion deems appropriate. Solely for purposes of example, Exhibit B sets forth an example of how Employee's Net Equity Production bonus and eligible discretionary bonus amount would be calculated using hypothetical numbers.

(ix) "Excess Travel and Entertainment Expenses" shall mean all travel and entertainment expenses incurred by Employee in excess of $200 without obtaining the prior written authorization of Employee's manager or Drew Milstein. A copy of the current policy is attached hereto as Exhibit C. For the avoidance of doubt, SIG is not required to reimburse Employee for any travel or entertainment expenses incurred by Employee in violation of SIG's travel and entertainment policies in effect from time to time, but if it pays any such amounts, such expenses shall constitute Excess Travel and Entertainment Expenses.

(g) Notwithstanding anything herein to the contrary, no salary or bonuses (whether fixed, Net Equity Production or discretionary) will be paid under this paragraph 3 in the event Employee resigns other than for Good Reason (as defined below) or is terminated for Cause (as defined below) prior to the award and payment of such salary or bonus by SIG. All compensation (including bonuses) shall be paid in accordance with SIG's normal payroll policies as in effect from time to time and shall be net of any applicable withholding requirements.

(h) Employee agrees and acknowledges that SIG may set off any amounts that he may hereafter owe to SIG against any amounts payable by SIG to him under this Agreement or otherwise.

4. Termination.

(a) By SIG. During the Term, SIG may terminate Employee's employment for Cause (as defined below) by providing Employee notice of the effective date of such termination (which effective date may be immediately). For purposes of this Agreement, "Cause" means either a) that Employee commits (or has committed) a regulatory or criminal violation, or becomes the subject of an investigation by any governmental, administrative or self-regulatory body or by any of his or her former employers, in either event, stemming from conduct alleged to have been committed by Employee while acting in his or her capacity as a registered representative or otherwise in connection with the trading of securities or other financial products or the Brokerage Business (as defined below), whether before or during his employment by SIG, that in SIG's sole discretion could be damaging to SIG's or employee's business reputation or b) a determination by SIG that Employee failed to act in good faith, in furtherance of the business interests of SIG or in accordance with the terms set forth in this Agreement or the standards of conduct and performance adopted by SIG generally for its employees, including by way of example only, any of the following: (i) a willful failure by Employee to perform his or her duties hereunder (including neglect of such duties); (ii) conduct by Employee that is materially injurious to SIG, monetarily or otherwise; (iii) a breach by Employee of any of his or her material obligations under this Agreement; (iv) Employee engaging in any criminal activity or other activity involving moral turpitude; or (v) any conduct by Employee involving significant undisclosed conflict of interest, serious impropriety, breach of corporate duty or misappropriation of any money or other assets or properties of SIG or any other party with which SIG does business.

(b) By Employee. During the Term, Employee may resign his employment for Good Reason, provided that Employee has given SIG written notice of the event or events constituting Good Reason and a reasonable opportunity (but not less than seven (7) nor more than ten (10) calendar days) for SIG to cure such event or events. For purposes of this Agreement, "Good Reason" means the relocation of Employee's primary place of

-4-

employment outside of Los Angeles County, California without his written consent.

(c) In the event Employee resigns other than for Good Reason or is terminated for Cause, neither SIG nor Employee shall have further obligations or liabilities hereunder, except: (a) SIG shall pay Employee, in accordance with SIG's normal payroll practices, all accrued but unpaid salary through such termination date and (b) the provisions of paragraphs 5 through 14 shall remain in full force and effect. In the event that on or before December 31, 2006, SIG terminates Employee without Cause or Employee resigns for Good Reason, neither SIG nor Employee shall have further obligations or liabilities hereunder, except that (a) after the termination date the provisions of paragraphs 6 through 14 shall remain in full force and effect, and (b) SIG shall pay Employee in accordance with SIG's normal payroll practices, (i) his or her salary pursuant to paragraph 3(a) until the earlier of the end of the Term and the occurrence of an Early Termination Event (as defined below), and (ii) so long as an Early Termination Event has not occurred prior to the end of the Term, the greater of (x) the unpaid Minimum Amount minus (I) the aggregate amount of gross salary Employee received from SIG pursuant to Paragraph 3(a) during the Term and minus (II) the gross amount of the fixed bonus Employee received from SIG pursuant to Paragraph 3(b) during the Term and (y) the amount of any unpaid Net Equity Production bonus earned by Employee from the Effective Date through the termination date. Any payments under clause (ii) above shall be made on the date that SIG generally pays bonuses to its employees in respect of calendar year 2006. An "Early Termination Event" shall occur if Employee, directly or indirectly, in any manner or capacity, engages in any activity (including the provision of corporate research or the Brokerage Business (as defined below)) reasonably similar to activities that Employee performed for SIG. Employee shall have an affirmative obligation to inform SIG in advance of the occurrence of an Early Termination Event prior to the end of the Term.

5. Exclusive Employment. In addition to other valuable consideration received by Employee, Employee acknowledges and recognizes the highly competitive nature of SIG's business and that as an Employee of SIG he or she shall have access to SIG trade secrets (as defined in the Uniform Trade Secrets Act) and other Confidential Information. Employee accordingly agrees, that until the later of the expiration of the Term and the termination of Employee's employment hereunder, Employee shall not, without the written consent of a Managing Director of SIG, directly or indirectly, in any manner or capacity (as a stockholder, sole proprietor, officer, director, employee, partner, agent, consultant or in any other corporate or representative capacity), engage (or assist or support any other person or entity) in any activity (including the provision of corporate research or the Brokerage Business (as defined below)) reasonably similar to activities that Employee performs for SIG. As used herein, the term "Brokerage Business" means the provision of research sales and/or sales trading and/or transaction execution services in any equity and/or equity related product(s) (including, without limitation, ETFs and options) and/or in any type(s) of product(s) that SIG is providing, or is planning to provide, at the time Employee's employment by SIG terminates.

6. Acknowledgments. Employee understands that the provisions of paragraph 5 hereof may limit his or her ability to earn a livelihood in a business similar to the business of SIG, but nevertheless believes that he or she shall

-5-

receive remuneration and other benefits hereunder sufficient to justify the restrictions contained in such provisions. Employee also acknowledges that because SIG's business is international in scope the restrictions set forth in this Agreement are reasonable in geographic scope, even though not limited to any particular area or market, and that, given his or her education, skills and abilities, these restrictions would not prevent him or her from earning a living. Employee recognizes that SIG would not employ Employee if Employee were not willing to agree to Paragraph 5. Employee further acknowledges that he or she shall not have the right to inspect or review or audit the books or records of SIG other than the Employee Account Statement and that SIG in its sole and absolute discretion has the right at any time and from time to time to add or subtract Employee Assigned Accounts, increase or decrease the Account NEP Percentage applicable to any Employee Assigned Accounts and increase or decrease the Supplemental Percentage applicable to any Employee Assigned Accounts.

      7.     Modification By Court. If for any reason a forum of competent jurisdiction shall find the provisions of paragraph 5 hereof unreasonable in duration, in geographic scope and/or in any other aspect, the prohibitions contained herein shall be restricted to such time and geographic areas and in such other manner as such court determines to be reasonable. Such restriction shall apply only to the operation of such provisions in the particular jurisdiction in which such adjudication is made.

      8.     Time. The length of time stated in Paragraph 5 (at least through December 31, 2006) shall not run during any period that Employee is in violation of any of the terms of Paragraph 5 and shall be extended for the period of any such violation.

      9.     Remedies. Employee acknowledges that SIG would be irreparably harmed if Employee were to breach any of the terms of this Agreement and, therefore, agrees that SIG shall be entitled to injunctive relief to prevent any breaches or threatened breaches of this Agreement and to specific performance of its terms as well as any other legal or equitable remedies it may have.

      10.    Survival. The obligations of the Employee under Paragraphs 5 through 14 shall survive the termination of Employee's employment with SIG.

      11.    Severability. If any one or more of the provisions or part of a provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity or enforceability of this Agreement in any other jurisdiction or any other provision or part of a provision of this Agreement, but this Agreement shall be reformed and construed in such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part reformed so that it would be valid, legal and enforceable in such jurisdiction to the maximum extent possible.

      12.    Successors. This Agreement shall not be assigned by Employee or by SIG except that SIG may assign this Agreement in the event of a change in control or sale of SIG in which case this Agreement shall inure to the benefit of SIG's successors and assigns.

13. **Governing Law.** This Agreement and questions relating to its validity, interpretation, performance and enforcement shall be governed and construed according to the laws of the Commonwealth of Pennsylvania. Employee and SIG submit to the exclusive jurisdiction of the state courts located in Montgomery County, Pennsylvania and to the Federal courts located in Philadelphia, Pennsylvania as to all actions and proceedings relating in any way to this Agreement that are not determined by arbitration pursuant to the Dispute Resolution Agreement referred to below. Employee and SIG further agree that such courts shall have personal jurisdiction over each of them and are a proper venue and a convenient forum with respect to all such actions or proceedings.

14. **Entire Agreement.** This Agreement, together with the Confidential Information Agreement, Non-Interference Agreement and Dispute Resolution Agreement, executed by the Employee as a condition of his or her employment, the terms of which are incorporated by reference herein, contain the entire understanding among the parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understanding, inducements of conditions, express or implied, oral or written except as herein contained. This Agreement may not be modified or amended, other than by an agreement in writing signed by the parties.

Sincerely,

_____
Thomas Kennedy, Director
For Susquehanna International Group, LLP

Agreed and Accepted:

_____
DOUGLAS L. FREY

Dated: 3/28/05

-7-